AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

FILED
SEP 09 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JCS

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Manuel Alvarez-Barajas and Azahel Andrade Reyna | ) ) ) ) ) | Case No.  3 19 71484 |
| Defendant(s) | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __July 18, 2019__ in the county of __San Mateo__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(C); 18 U.S.C. § 2 | Possession with the Intent to Distribute and Distribution of a Controlled Substance; Aiding and Abetting thereof.<br><br>Maximum penalties: 20 years' imprisonment; $1,000,000 fine; minimum 3 years' supervised release; maximum lifetime supervised release; $100 special assessment; forfeiture; potential denial of federal benefits, and potential deportation |

This criminal complaint is based on these facts:

See Affidavit of Suzzette S. Abbasciano

☑ Continued on the attached sheet.

Approved as to form _____
AUSA Erin Cornell

_____
Complainant's signature
Suzzette S. Abbasciano, DEA Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 9/9/19

_____
Judge's signature

City and state: San Francisco, CA                Hon. Joseph C. Spero, Chief U.S. Magistrate Judge
Printed name and title



# AFFIDAVIT IN SUPPORT OF AN APPLICATION
# FOR A COMPLAINT

I, Suzzette S. Abbasciano, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state:

## I. INTRODUCTION AND PURPOSE OF APPLICATION

1. I make this Affidavit in support of an application for a criminal complaint charging Manuel ALVAREZ Barajas ("ALVAREZ") and Azahel ANDRADE Reyna ("ANDRADE") (collectively, "DEFENDANTS"), with Distribution and Possess with Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and Aiding and Abetting in violation of 18 U.S.C. § 2.

## II. AFFIANT EXPERIENCE AND BACKGROUND OF INVESTIGATION

2. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18 United States Code, Section 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to initiate arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3. I am a Special Agent ("SA") employed by the DEA, and have been so employed since January 2018. I am currently assigned to the San Francisco Field Division. I am authorized and am presently assigned to investigate violations of the Controlled Substance Act ("CSA"), Title 21, of United States Federal Code, and other violations of federal law.

4. Prior to becoming a DEA Special Agent, I was a crisis response analyst with Uber Technologies Inc. In this capacity, I assessed Uber's responses to crises related to terrorist and organized crime attacks, natural disasters, and other major emergency events. I also updated and developed protocols and risk assessments to assist in Uber's mission to complement the emergency services of a given location. Prior to working with Uber, I served as a crisis response analyst with the North Atlantic Treaty Organization (NATO), where I assisted in developing large scale military exercises for Alliance, including at the Defense Minister and Ambassador levels, which took into account threats posed by terrorist and organized criminal networks. I was

also a research analyst and project manager with the National Consortium for the Study of Terrorism and Responses to Terrorism (START), a Department of Homeland Security Center of Excellence, focused on analyzing a potential terrorism-organized crime nexus in relation to radiological and nuclear material trafficking. With START I conducted risk assessments on over 200 terrorist or organized crime groups, helped develop interactive GIS materials on groups' trafficking routes, and conduct network analysis to identify trafficking hot spots in South and Central America and Europe.

5. I have had the opportunity to work on multiple organized crime, illicit trafficking, and terrorism related grants, and to conduct international field work as a criminology doctoral student. Through these opportunities I have been able to speak extensively with experienced law enforcement, military and intelligence officers, and researchers about illicit trafficking networks and their smuggling routes and methods. I have collected, organized, and analyzed material related to drug trafficking network structures, leadership hierarchies, group composition and skill sets, and their relationships with supporting and rival groups.

6. During my employment with the DEA, I have received nineteen weeks of full time formalized education, training, and experience at the DEA Basic Agent Training Academy in Quantico, Virginia. This education, training, and experience included but was not limited to drug detection, drug interdiction, money laundering techniques, and schemes and investigation of individuals and organizations involving the smuggling, cultivation, manufacturing, and illicit trafficking of controlled substances. As a Special Agent, I have participated in multiple narcotics investigations either as a case agent or in a supporting role. I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations. I also have participated in many aspects of drug investigations including, but not limited to, telephone toll analysis, and records research, physical and electronic surveillance. I have participated in the execution of several federal and state narcotics search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics. In addition, I have attended seminars and courses on money laundering and internet investigations related to drug trafficking.

7.	Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of numerical codes and code words to conduct business. I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

8.	The information contained in this Affidavit is based upon my personal knowledge, obtained from my role in this investigation and from information relayed to me by other law enforcement personnel involved in this investigation, in particular from other DEA Special Agents. Additional information contained in this Affidavit was obtained through law enforcement database queries for suspects and properties, analysis of county property records, and other official records.

9.	I have not included each and every fact known to me concerning the investigation. I have set forth only the facts that I believe are necessary and appropriate to establish probable cause for the search warrants regarding the violations described herein. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another DEA Special Agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. There is probable cause to believe that the DEFENDANTS violated 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2, by possessing large amounts of heroin with intent to distribute, distributing heroin, and aiding and abetting the distribution of heroin.

### III.	RELEVANT STATUTES

10.	Pursuant to Title 21, United States Code, Section 841(a)(1), it is unlawful for any person to "knowingly or intentionally ... manufacture, distribute or dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance."

11. Pursuant to Title 18, United States Code, Section 2, it is unlawful for any person to take an affirmative act in furtherance of an offense (here, distribution and possession with intent to distribute a controlled substance) with the intent of facilitating the offense's commission.

## IV. FACTS ESTABLISHING PROBABLE CAUSE

### A. Background

12. The DEA is conducting a criminal investigation into the drug trafficking activities of Manuel ALVAREZ Barajas and Azahel N. ANDRADE Reyna and their organization. As part of this investigation, DEA introduced a Confidential Source ("CS-1")[1] who posed as a heroin and methamphetamine customer in dealing with ALVAREZ. CS-1 has been communicating, including voice calls and text messages, with ALVAREZ. As discussed below, the investigation revealed that ALVAREZ worked with ANDRADE in the drug trafficking enterprise, and ANDRADE was directly involved with at least two of the sales to CS-1 (on April 22, 2019, and July 18, 2019).

### B. March 27, 2019, Free Sample of Heroin

13. In March 2019, CS-1 communicated with Alvarez over both voice and texts, to negotiate a half-kilogram heroin purchase.

14. On March 26, 2019, CS-1 called and texted ALVAREZ, to discuss prices and quantities of heroin and methamphetamine. ALVAREZ told CS-1 that the heroin he received came directly from Mexico, and the price per kilogram of methamphetamine was $1,500. ALVAREZ said he also sold acid and china white heroin.

---

[1] CS-1 has been cooperating with the DEA since 2019. CS-1 is working for judicial consideration arising from his/her arrest in 2018 on drug-related charges regarding possession of controlled substances. A review of CS-1's criminal history shows multiple arrests for driving while under the influence. To date, CS-1's handlers have not known CS-1 to provide any information determined to be false or misleading. CS-1's handlers are often able to corroborate CS-1's information through surveillance and other sources. Based on that corroboration, CS-1's handlers believe CS-1 is reliable. Additionally, CS-1's handlers have instructed CS-1 to contact ALVAREZ on a consensually monitored telephone.

4

15.  On March 27, 2019, ALVAREZ appeared at CS-1's place of work to discuss narcotics transactions and to reconfirm CS-1's interest in purchasing heroin. Before leaving, ALVAREZ provided CS-1 with approximately 5.3 grams of suspected black tar heroin as a free sample. The sample was later tested in a lab and was found to contain heroin.

### C.   April 11, 2019, Attempted Controlled Buy of Heroin

16.  On March 30, 2019, ALVAREZ contacted CS-1 to ask CS-1 when he/she would be interested in purchasing a half kilogram of heroin, and initiate a continuous relationship for future transactions.

17.  On April 3, 2019, CS-1 and ALVAREZ again discussed a transaction for a half-kilogram of heroin. ALVAREZ reconfirmed his ability to supply CS-1 with the heroin and added he had recently received a "very pure" form of methamphetamine. Furthermore, ALVAREZ said his boss, later identified as ANDRADE, would be interested in meeting CS-1 after the first transaction to discuss deals involving larger quantities in the future.

18.  On the evening of April 10, 2019, ALVAREZ agreed to sell CS-1 a half kilogram of heroin the following morning in San Mateo.

19.  In the morning of April 11, 2019, CS-1 received a text message from ALVAREZ, who used telephone number 650-921-7192, noting in Spanish, "le voy a quedar mal hoy mil disculpas" (translated to mean, "…I'm going to let you down today, a thousand apologies").[2] CS-1 told agents he/she did not believe ALVAREZ was in possession of the heroin, and therefore could not complete the transaction that day.

20.  Based on toll analysis for that day, ALVAREZ contacted ANDRADE approximately nine times prior to his initial text message to CS-1. ALVAREZ contacted ANDRADE after calling and texting CS-1 to negotiate moving the transaction time to later in the day or in a different location. CS-1 refused to wait much longer for ALVAREZ to conduct the controlled purchase. ALVAREZ then contacted ANDRADE approximately four additional

---

[2] This is an unofficial translation. An official translation may differ slightly.

times that day. Based on my training and experience, and from discussions with other agents, drug traffickers often contact one another to complete drug transactions if they are short or lack product to sell. Therefore, I believe ALVAREZ contacted ANDRADE to obtain the heroin to be sold to CS-1.

### D. April 22, 2019, Controlled Buy of Heroin

21. After the unsuccessful attempt to purchase a half a kilogram of heroin from ALVAREZ on April 11, 2019, CS-1 remained in contact with ALVAREZ to renegotiate the transaction.

22. In the days prior to April 22, 2019, ALVAREZ confirmed his ability to sell half a kilogram of heroin to CS-1. They agreed to meet on April 22, 2019. At approximately 5:42 a.m. on April 22, 2019, ALVAREZ contacted CS-1, stating he was near Hayward and on his way to San Mateo.

23. Shortly after 6:30 a.m., ALVAREZ drove into the parking lot where the transaction was to take place and parked next to CS-1's car. ALVAREZ got into CS-1's car and asked if CS-1 had the money. After CS-1 confirmed that he/she had the money, ALVAREZ got out of CS-1's car and walked to the back of the truck he was driving. Agents saw a Hispanic male, later identified as ANDRADE, get out of the truck and meet with ALVAREZ. ANDRADE helped ALVAREZ retrieve a white painter's bucket from the truck bed, after which ALVAREZ got back into CS-1's car carrying the bucket. Once inside CS-1's car, ALVAREZ showed CS-1 a rectangular-shaped object that was wrapped in black tape and stated it was a half kilogram of heroin. ALVAREZ added he also brought CS-1 a sample of methamphetamine and "China White" heroin. CS-1 then gave ALVAREZ one envelope containing $2,000, considered ALVAREZ's commission, and another envelope containing $9,500.

24. A review of tolls for the same day indicate ALVAREZ only contacted ANDRADE one time, approximately twenty minutes prior to the transaction. Based on my training and experience, and discussions with other agents, in an effort to insulate himself, ANDRADE uses ALVAREZ as a distributor of methamphetamine and heroin.

6

### E. July 18, 2019, Controlled Buy of Heroin

25. Beginning in May 2019, CS-1 began telling ALVAREZ about an associate of his/hers who was interested in purchasing "China white" heroin. On May 25, 2019, the CS gave ALVAREZ the contact information for his/her associate, who was a DEA Task Force Officer acting in an undercover ("UC") capacity. The UC and ALVAREZ then initiated negotiations for the purchase of one kilogram of heroin for $21,000.

26. Throughout July 2019, the UC and ALVAREZ discussed a future one kilogram "China White" heroin purchase. On July 17, 2019, the UC confirmed interest in purchasing one kilogram of heroin for $21,000.

27. On July 18, 2019, members of San Francisco Field Division (SFFD) Financial Investigations Team (FIT), Metro Team, and Task Force II followed ALVAREZ and ANDRADE from Modesto to Burlingame, where ALVAREZ sold one kilogram of "China White" heroin to the UC for $21,000. ALVAREZ directed the UC to obtain the heroin from inside a toolbox, which ALVAREZ had placed near some bushes under a tree. Inside the toolbox was what appeared to be approximately one kilogram of heroin. The substance was later tested with the TruNarc analyzer and it tested positive for the presence of heroin.

28. During the conversation between the UC and ALVAREZ, ALVAREZ continuously motioned towards ANDRADE (who remained in the car), stating "he" in reference to ANDRADE, could supply the UC with more black tar or China White heroin.

29. Once the evidence was taken into custody, agents found ANDRADE's work identification card with his picture and full name inside the toolbox.

### V. CONCLUSION AND REQUEST FOR SEALING

30. For the reasons identified above, it is my opinion that there is probable cause to believe the DEFENDANTS have violated Title 21, United States Code, Section 841 (a)(1) and Title 18, United States Code, Section 2. Therefore, I respectfully request that the issuance of a complaint against the DEFENDANTS and a warrant authorizing their arrest.

31. Because this is an ongoing and confidential investigation, I ask that this

application, this affidavit, resulting complaint, and all associated documentation be filed under seal so that the DEFENDANTS are no prematurely alerted to the existence of this investigation and/or the scope and direction of the investigation.

I swear under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

						_____
						SUZZETTE S. ABBASCIANO
						Special Agent
						Drug Enforcement Administration

Sworn and subscribed to before me
This ___ day of September, 2019

_____
HON. JOSEPH C. SPERO
Chief United States Magistrate Judge